I'm Philip Dyche and I'm appearing for the appellate. When Mr. Leichner pled guilty, he was 57 years old. The plea agreement involved in this case and the plea colloquy basically are in accord. When he pled guilty, he made certain admissions. The admissions were regarding the number of victims. The admissions that he made in both the plea agreement and the plea colloquy, basically he was in accord with the number, the loss figure that was set forth. Hold on, let me ask you about what interests me most in the case. The judge made a mistake. The judge told him the wrong max, told him 20 years when it was actual, it should have been 35. But then the judge gave him the benefit of the judge's mistake and only sentenced him to 20 years. When his guideline sentence and to judge by the judge's remarks, the judge's inclination would have been more. So it's hard to see what harm is done by the mistake. It looks as though it redounded to the benefit of Leichner. What am I missing there? Not actually, Your Honor. Had a 57-year-old man, when he pled guilty, been apprised of the potential that he faced a maximum exposure of 35 years that would potentially release him when he was close to 100 years old. At 57? At 57. I think a lot of us around that age would think 20, 35, what's the difference? Well, I'm not sure about that. I'm 74 and so I can understand that thinking. But certainly when a person is that age and looking at a sentence of 35 years as a potential exposure, had he known that, the choices that he made with regard to pleading guilty might have been different because he certainly would have been exposed to that figure. But he got the expectation. I mean, that's Judge Kleinfeld's point. He thought he was only going to get 20 or could get a max of 20 and that's all he got was a max of 20. He didn't think that he was going to get 20. He knew it was possible that he could get 20. It was possible. But the reality was that there was an accord, in my view, that occurred at the time that Mr. Leichner pled guilty. Basically, the accord was offered by his lawyer. It was agreed to by the prosecutor. It was agreed to by the judge. And that is that there was going to be an accounting. We have to remember, I think, that this was the allegation. The underlying allegation was as a Ponzi scheme, that is, the notion that this was a fraud of initio. And so as a result, the prosecution's theory of the case was that every investor and all the amounts were part of the fraud. Yet in the discovery that the defense never had access to, there were a number of boxes that indicated that for a number of years these companies operated properly. That is, they made investments. There were some profits. There were some losses. But for a period of time, probably at least two or three years, there were a number of legitimate investments which the records disclosed. So it looks to me, at least, as if Mr. Leichner's state of mind at the time that he entered his plea was that he figured that he agreed to 20 years. Wait. I'm getting mixed up. He's told 20. He knows he can get 20. He's hoping to get three or four. The judge made a mistake. He should have told him 35 is your max. He still would have thought he's going to get three or four. What's the difference? Why didn't he just get the benefit of a mistake in his favor? Well, he may have thought that he would get three or four, but certainly when you make the choice of entering into a plea of guilty, you have to take into consideration the potential of what the ultimate complete exposure is. Well, why doesn't it cut the other way? If his complete exposure had really been 35 years, maybe he wouldn't have taken a chance on it because he would have thought of people he knows in their late 70s who were still highly capable and productive people. But the fact of the matter is, once the judge made his mistake and stuck to it, really turned into 20. And that is because the judge apparently dealt with the notion of 20 as an agreed-upon figure that there had been an accord among the parties that that's what he was going to get, and that wasn't the situation. I can see where he might have thought he'd get three or four, but, frankly, it just seems like a silly expectation. I mean, a lot of people would volunteer to do four years in prison to get $100 million. He didn't get $100 million, and the evidence does not suggest that. The difficulty is that there was always apparently the incorrect perception that the $100 million or the figure that was bandied about was the actual loss figure, when, in reality, it wasn't. Because, as I indicated, there were a number of years in which there were legitimate trades. Not every investor, not every investment constitutes a Ponzi loss, constitutes a fraud loss. And he, in my view, was entitled to be able to present to the court by looking at the records and seeing what were legitimate investments that were properly invested for investors. Well, he was entitled to do that. But he didn't get it. He didn't do it. I mean, but that's his problem. He was no one stopped him from doing it. Well, it got stopped in the sense that the documents from which he would have needed to project the investigation got turned over to a civil accountant. Did they not give him his computers back? But the computers were not everything. The computers contained some of the information, but the computers were not the original files. The computers had some of the information. But the computers, and I think that was the argument of the prosecution, the computers did not have all of the information. What needed to be done was that the files would have to be gone through to find out what were the legitimate investments made by the companies, made by the Leichners, and what were not. Was there any evidence that Leichner ever asked to see any of those files, either when they were in the prosecutor's possession or the receiver's possession and was denied the opportunity to look at them? He was at the detention hearing prior to the time that he pled. There was an indication by counsel that there was the intention to do an accounting. That was always the theory. They were going to do an accounting, and the figures that were agreed to were essentially rebuttable. That was the state of mind of the defense. Certainly that was Mr. Leichner's state of mind, that they were rebuttable. Did anyone ever stop him from doing it? Well, once the documents, once the original records that would have been the source of that investigation got taken out of official custody and placed into the- Wait a minute. They weren't sent to Timbuktu. They were just sent to the receiver's accountant. Is that right? They were sent to the receiver's accountant, and the chain that thereby broke the chain of custody, and under I believe it was the Edwards case that we cited, that makes them presumptively unreliable. Well, Leichner could still look at them, right? Well, he could look at whatever's there. So there was nothing to stop him from looking at them when they were in the accountant's office? There was a stipulation that permitted that to be done. For whatever reason, trial counsel chose not to do that because he felt that the chain of custody had been broken. That's the government's problem, though, isn't it? No, it's not the government's problem. I don't see why chain of custody even applies to non-fungible items anyway. Well, I think it does to the extent that there is at least a presumption that the documents that were taken from official custody into the hands of some person not sworn to uphold the integrity of those documents, when they – when those documents are transferred to someone who does not have an obligation to care for them, the chain of custody I think is broken, and there is a presumption of unreliability. I don't get why it matters. It seems to me Leichner would know his own business. He could guide his accountant. His accountant could go through the documents, whether they were at the prosecutor's office or the accountant's office, and come up with a report to the court saying, here's what the real investments are, here's what the net losses are, after you look at the real investments and the real gains and the real payoffs to investors. And there's just nothing to stop them. And if the government wants to say, well, the documents are unreliable through our own fault of passing them around and re-boxing them, then the judge can decide whether to discount Leichner's accountant's report on account of that. I think the Court has a valid point. I think, however, what should have happened is that the district court should have requested and demanded that there be a hearing. In other words, the defense be given the opportunity to look at these documents, to make whatever analysis they could, and there were, for example, 65 boxes missing from those, the number of boxes. We don't know if any documents are missing, though. It may just be that they were re-boxed. But we don't need that. If Leichner had looked at them and said, gee, I'm missing three years here, that's different. But he never looked. Well, Leichner was in custody, so there wasn't a whole lot that could have been done. Well, it wouldn't have been Leichner personally. I mean, it can be Leichner's lawyer or his accountant. But apparently the premise of trial counsel at that point was that once they left official custody, that the contamination was sufficient, that they were no longer trustworthy. And that may be a valid point. That certainly is one of the premises that we are relying upon, and that is that essentially the loss of physical custody deprived the potential of a reasonable investigation. And I think the court should have directed a hearing on that issue, including the whole question of whether or not these documents were admissible in evidence for any circumstances once the chain of custody is broken. But getting back to the original state of mind issue, it does appear. We're talking sentencing. And as I remember, what is it, Rule 1011? It says the rules of evidence don't even apply in sentencing. I just don't see what barrier there would have been to an accountant's report or an accountant's report that there were gaps because some records had apparently been lost. I just don't see any problems. Well, apparently trial counsel did feel that that was an impenetrable barrier. Nonetheless, there is still the issue, I think, of what his state of mind was at the time that he entered his plea. And we did raise a number of issues dealing with the validity of his plea, both under Rule 11 and the potential of a withdrawal, and also whether it was voluntary. I do think the record is very clear that at the time that the plea was entered into by Mr. Leike, because of the colloquy between his counsel, the court, and the assistant United States attorney, that colloquy, the indication was that there would be an opportunity at that point to do an accounting. There was never any warning, according to the record, there was never any warning by the assistant U.S. attorney that these documents would leave his custody. In fact, there was a misrepresentation. I think we've been through that. You might want to save a little time. All right. Then I'm prepared to submit it, Your Honor. I think I have said what I can. Thank you, counsel. Thank you. Good morning, and may it please the Court. Byung Soo Kim for the United States. Your Honor, there are two issues that Your Honor was just discussing with Appellant's counsel. The first issue relates to the statutory maximum misadvisement. That issue goes to either the voluntariness of the defendant's plea or to the denial by the district court of his motion to withdraw under Rule 11's fair and just basis. The second issue, Your Honor, relates to the accounting issue, and that issue in turn raises Brady and loss of evidence claims. That issue, just so that we're clear on the state of the field, really cuts across a number of different phases of this case. It relates to sentencing. It relates to whether the defendant, excuse me, the government breached its plea agreement. Could you comment just a little bit on the argument that the loss calculation is wrong because for a number of years it was a legitimate business genuinely investing its investors' money? Yes, Your Honor. If you look at the criminal complaint affidavit, in particular, excerpt of record number I believe it's 33, that makes clear that the government's theory in this case was never that there was no legitimate foreign currency trading being done with the money that was being obtained by the defendant from the victims in this case. That page makes clear that as much as 20 percent of the funds that were being taken from the victims was used for foreign currency trading. And the significance of that, Your Honor, and I assume the reason for your question is that the fact that the defendant maintained during this case and its sentencing especially that these boxes that were allegedly missing would have shown legitimate currency trading, the response is really not to be too colloquial, but it's so what? The government's theory was never that all of the trading was improper. The government conceded at the very early stages of the case that some of the money was being used for foreign currency trading. And so the fact that these allegedly missing boxes would have shown that to be the case, the government's really at a loss as to understand how that really would affect the sentencing calculations that the defendant stipulated to. The issue, it seems to me, would be this. If Leichner raises $130 million from investors, he thinks and they think that he's a genius at currency trading and they're all going to get as rich as George Soros did by currency trading. It turns out he invests the whole $130 million and it turns out he's either not as smart or not as lucky as Soros and they lose every penny of it. It's not a fraud. He doesn't go to jail. Everything's fine. The government's theory, as I understood it, was he takes the money and instead of trading currency, he just lives high on the hog. That is the government's theory, but the government also conceded from the very beginning that some of the money was actually used for foreign currency trading that may have been legitimate. I guess the question is how much. Well, as much as 20 percent, but in the government's mind, that didn't make it any less of a fraud because certainly the victims didn't think that 80 percent of their money was going to be used to buy cars. The victims think they should have gotten as rich as George Soros. What I want to know is was there ever an accounting that shows whether he was just like most people that run big currency trading operations, driving around in Rolls Royces and flying in private jets, or as a part of the overhead of that sort of business, or was he a crook? Was he just taking the money instead of investing it? How do we tell without some kind of accounting? Well, Your Honor, it's unclear from this record what kind of accounting was done. In the motion to withdraw papers that were filed in the district court, the defendant's counsel did state that he went to the bankruptcy trustee's office. He saw there 164 boxes and five plastic bins. It's unclear to what extent, if any, that he then examined those documents. I would note also that Mr. Leichner asked at a certain point during this time period to be transferred to the Metropolitan Detention Center in Los Angeles in order that he could review documents and be more accessible and closer to the documents in this case. Is the government's theory basically that 80 percent overhead, it's really not a legitimate business? Yes, Your Honor. And I would just note that at the sentencing, even as late as the sentencing, after all of these discovery issues had come, the defendant stated during his allocution that he was guilty. He stated that. And he said the only thing that I still have some disagreements about, Your Honor, is with respect to the loss calculation. Can you tell me about the discovery stipulation? What was that? The discovery stipulation, Your Honor, came after at the motion to withdraw the plea. There was a discussion at the end of that hearing about remaining discovery issues. And this related to the accounting? Yes, Your Honor. Okay. What was the stipulation? And the stipulation was essentially that the government would make available to the defense discovery that was in its possession. And the government proceeded to do that. Was there any further objection to what the government provided? No, Your Honor. And at the sentencing hearing, which is the next time that these issues are aired in the district court, the district court asked the defense counsel repeatedly, well, what's your offer of proof, counsel? If you don't agree with the government, if you're now going back on what you stipulated to at the change of plea colloquy, and if you disagree with the probation office, well, what do you think the loss amount in this case? The defense counsel said, Your Honor, I can't answer that question. I can't give you any estimate. I can't tell you if the accounting that I have done or would do would bring the loss from $97 million to less than $50 million, Your Honor, which would be the next cutoff for purposes of the sentencing guidelines. He didn't say any of that. All he said was, well, Your Honor, I just can't, I can't give you any offer of proof. And then the district court, I think, reasonably responded by saying, well, in light of the stipulation by your client, in light of the probation office's PSR, in light of what the government has told me, I'm not sure what choice I have except to assign loss in the amount of $50 million to $100 million, which is what the district court said. Which is what was admitted in the plea agreement. Well, in the plea agreement, Your Honor, the defendant actually admitted to $130 million. With respect to the statutory maximum misadvisement, Your Honor, which Judge Kleinfeld asked about initially, first of all, I do want to say that it wasn't simply Judge Walter's mistake. It was the government's mistake that the defendant was misadvised, because the government placed in its plea agreement that essentially the statutory total maximum penalty was 20 years, when in fact it was 35 years. But the fact remains there was no prejudice. And if I could just briefly explain why that's so under the case law. The seminal case by this Court is the Davis case. It's a recent case by Judge Breyer in the Northern District of California. And what Davis says, and it's very clear, is that you don't have to show the same level of prejudice that you would in the involuntariness context. In other words, you don't have to show a reasonable probability that the person wouldn't have pled guilty, but you still have to show some prejudice. You still have to show that it plausibly would motivate a reasonable person to plead not guilty. And the problem here is that the defendant can't meet either standard. The facts of the Davis case, I think, illustrate this. In Davis, the facts were that the defense counsel allegedly advised the defendant that he would get probation. There was some factual dispute over whether that was in fact stated to the client or not. And what the district court said was, well, you know, because you haven't shown that the plea agreement was invalid or the plea was invalid, we're going to reject your Rule 11 motion to withdraw. And this Court said, no, that's not the standard. And so it remanded for a determination of prejudice. I would submit to you that for Davis to be similar to this case, in Davis, the district court ultimately sentenced the defendant to something like eight years after his lawyer had advised him he could get probation. The analog, I was thinking, with this case would be if in Davis the district court had said, well, Mr. Defendant, in light of your lawyer's misadvisement, I'm going to actually give you probation. So you have absolutely no prejudice. Whatever your lawyer misadvised you, I'm going to actually give you. That's essentially what happened in this case. A mistake was made, and then the district court said, you know what, I'm going to actually abide by the 20 years intent of the parties, and I'm going to give you no more than 20 years. And that's what the district court did. You know what I've been thinking about? Suppose the judge had misadvised him in the opposite way. Suppose the judge told him this offense is punishable by death. And the guy says, well, I pled guilty, I took 20 years, I grabbed it to, you know, to save my life. Then I suppose he could come back and say, you know, I took that deal because I thought I was facing the death penalty. But the converse is what you're saying. He was not prejudiced because he got the mistake was applied in his favor. Is that? Well, I'm not sure I fully understand the question, but I do think that there are two different kinds of situations. A defendant can be either told that his stat max is lower than it, in fact, is, or that it's higher than it, in fact, is. And under both situations, there could be situations of involuntariness or a basis to which the judge told him he could only get 20 and then he sentenced him to 35. There would be no question that wouldn't hold up. I completely agree with that. And then in my hypothetical, if the judge grossly overstates what the maximum is, we could assume that maybe the defendant pled guilty with the understanding that he would only get 20 years when he wasn't even facing as much as he thought. That's right. But in the situation we have, he was advised in such a way that he got what he thought he was going to get, even though the information he was given was wrong. I understand your question, Your Honor. Yes, I think that's absolutely correct. This is not a situation where the defendant or where the district court is advising him of a maximum penalty that's far in excess. I guess the way that I'm trying to think of at least hypothetically how it could matter, and I'm thinking, let's say the judge tells you, the judge tells you, your lawyer tells you, and the prosecutor tells you, your case seems to be just a run-of-the-mill routine case, nothing extraordinarily bad or extraordinarily good about it as this particular type of case goes. You're told the max is 20, so you're thinking, I'm looking at less than the max because it's just straight down the middle case. Max is 20 on bank robbery, say, but they usually get somewhere between 4 and 10. I think that's absolutely correct. Then you find out the max is 40, so the run-of-the-mill straight down the middle sentence is 20. Right. If this were a case where the guidelines actually came out to less than the statutory maximum, I think that what you're saying might describe a situation where it could matter. In this case, though, the guideline sentence was far in excess of the 20 years that the plea agreement basically capped the defendant's exposure at. So for the defendant to have an expectation that he was going to get 4 years or 5 years or whatever just does not seem reasonable on this record, given that his guideline sentence was so far in excess of what the statutory maximum was. Unless the Court has any other questions, I'll submit. Thank you. Thank you, counsel. Yes. The plea agreement was also a cooperation agreement, so aside from the whole issue of the extent of the loss, I think the defendant may have had a reasonable expectation that he would have a lighter sentence based on the potential of cooperation. Getting back to the stipulation that I think the Court mentioned, the stipulation was regarding the access by the parties, that is, particularly the defendant, of the hands of the bankruptcy trustee. They entered in the stipulation in order to create that access. It was not an agreement on the part of the defense that the transfer to the bankruptcy trustee or the bankruptcy trustee's accountant was an appropriate action. It was just simply access. Let me tell you what's on my mind about this so you can address it. I just don't care about that transfer. I don't see that it matters. I don't understand why chain of custody matters, because the rules of evidence don't apply. It all seems to me like something that can't affect anything here. The reason is, Leitner admits that he committed the fraud. He admits that he did these, that he commingled assets, that some investor money was used to pay him, that he couldn't guarantee profits as he pretended, and he rarely returned the investor's funds. And the scheme generated gross proceeds of $130 million. And he agrees that the loss is more than $100 million. So it looks like he's kind of boxed in there. And as far as the records go, there's nothing to stop him from having his accountant look. What bothers me is, if there's any remedy here, it looks like it's maybe an ineffective assistance on federal habeas, because the fact that there's overhead charge to the investors doesn't make it a fraud. The fact that profits aren't guaranteed, well, depending on how firm his representations are, maybe that does, maybe it doesn't. And gross proceeds from the investors of over $100 million, and even losing the money doesn't make it a fraud. So what I feel like is I have unanswered questions. I have concerns about whether Leitner is as guilty as all that, only he admitted it all, and there's nothing to be done in this case, and he had full access to the records. So it looks like there's just nothing to be done here. Well, I think, in all fairness to Mr. Leitner, it's pretty clear that his state of mind was the time that he entered his plea and made those admissions were those figures that he agreed to were rebuttable and were going to be rebutted by the accounting that actually occurred, or that was to have occurred. I think his lawyer at that point said, we are in the process of undergoing and doing an accounting. And so it was his state of mind, apparently agreed to by the prosecutor and by the court, that that was something that was going on in process. Now, he knows that his Leitner knows his own business, and I think to the extent that he made the admission that he was guilty of fraud, that's one thing, but to make an admission of the figures that would put him in jail for the rest of his life. He admitted he stole more than $100 million. Well, he did, but he, by the time he made that admission, it was pretty clear that his state of mind was that that was going to come down by virtue of accounting. Otherwise, why have an accounting at all? That's like our last case with the negotiable instrument where $5 million doesn't mean $5 million. I mean, there's a verity to what is in these plea agreements. He had the right, I suppose, to come back and try to offer additional evidence, and he said he was going to try to do that. And the judge said, if you can come up with additional evidence, fine, I'll hear it, but he never did. And so we're stuck, as, you know, Judge Kleinfeld says, with A, his admission that he stole the money, and B, that there were, you know, it was over $135 million and there were 300 investors. But I do think that, and I do understand the Court's point, that I do think, however, that to the extent that he was deprived of the records in the sense that they were taken from official custody creates a serious problem in terms of the trustworthiness of an ultimate investigation. So what? It works in your favor. Kind of like on the other side when you have a lousy case and then the other side carelessly engages in spoliation. It's wonderful. It's a gift. I understand your point, Your Honor. Anyway, the matter is submitted at this point. Thank you, Justice. Thank you, counsel. United States v. Weichner is submitted. We are adjourned until 9 a.m. tomorrow. Thank you.
judges: Lay, Kleinfeld, Silverman